IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KACEY HARPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:17-cv-721-ALB |
| | ) | |
| HOUSTON COUNTY BOARD OF | ) | |
| EDUCATION, a local education | ) | |
| authority; | ) | |
| TIM PITCHFORD, MARSHA | ) | |
| SHELLEY, and BRANDY WHITE, | | |
| each in his or her individual capacity, | | |
| | | |
| Defendants. | | |

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the court on Defendants the Houston County Board

of Education, Tim Pitchford, Marsha Shelley, and Brandy White's motion for

summary judgment. (Doc. 26). Plaintiff Kacey Harper taught as a non-tenured

teacher at Webb Elementary School. Her teaching career at Webb Elementary ended

abruptly at the end of her third year when the Houston County Board of Education

("the Board") nonrenewed her contract. Now Harper complains that the nonrenewal

was unconstitutional retaliation, suing the Board and three persons in their individual

capacities: Tom Pitchford, superintendent for the Board;[1] Marsha Shelley, principal

---

[1] Tom Pitchford was superintendent at all times relevant to this case. Following his retirement,
Sewell became the current superintendent winning an election. (Doc. 26-3 at 2–3).

of Webb Elementary School; and Brandy White, assistant principal of Webb. Specifically, Harper complains that she was nonrenewed because (1) she reported to the State Board of Education that another teacher was allegedly cheating on a standardized test, or (2) she declined to support her supervisor's preferred candidate for superintendent.

Upon consideration, the motion is GRANTED.

## BACKGROUND

Harper's complaint stems from an election and an investigation.

Harper taught at Webb Elementary during the election for Houston County Superintendent. Being part of Houston County, many employees of Webb Elementary took an interest in who their next boss would be. (Doc. 26-1 at 9). Unremarkably, some employees, including White, assisted in the various campaigns. (Doc. 26-1 at 9).

The investigation began with some allegations of cheating on the ACT Aspire test. At the time of this dispute, all public schools in Alabama took this test, which employs a variety of safeguards to prevent cheating. (Doc. 26-9 at 3). In Spring 2016, the Houston Board of Education received anonymous allegations of cheating and reported the allegations to the State Department of Education. (Doc. 26-9 at 3–4). The State asked Joseph Haddock to investigate the allegations. (Doc. 26-9 at 4). At Superintendent Pitchford's suggestion, a third-party, Dr. Ronnie Jackson, assisted

with the investigation. (Doc. 26-2 at 8; Doc. 26-9 at 4). As part of the investigation, Haddock and Jackson interviewed "each faculty member at Webb during the 2013–2014 and 2014–15 school years." (Doc. 26-9 at 4). During the interview with Harper, she told Haddock and Jackson:

> There was investigation, the ACT Aspire, of reports of … cheating on the ACT Aspire. And when investigations took place with Mr. Haddock and the gentleman from the State and questions were asked to all staff members, I gave my truthful statement of what I had witnessed. And due to that being Ms. Shelley's niece, then when that got discussed, later date, that was what I was—I was nonrenewed because of me telling what I had witnessed and it being Ms. Shelley's niece.

(Doc. 26-1 at 4). According to Haddock, Harper told him and Jackson that "during a professional development training, Brandi Paramore showed teachers an exemplar and commented 'that was on the test.' Ms. Harper denied knowledge of any actual testing violations." (Doc. 26-9 at 4). Haddock noted that "[d]uring the interview and investigative process, no one provided information concerning an actual testing violation." (Doc. 26-9 at 5). Ultimately, Haddock did not find any substance to the allegations during his investigation.

*Harper's Testimony*

Harper does not know when Defendants made the decision to nonrenew her. (Doc. 26-1 at 8). But Harper believes she was nonrenewed for two reasons. First, Harper told the investigators that Shelley's niece, who was also a teacher, was cheating on the ACT Aspire. (Doc. 26-1 at 4). Second, Harper believed that Shelley

thought she did not support Shelley's preferred candidate for superintendent, Matt Swann. (Doc. 26-1 at 9).

As to Harper's first claim, it is undisputed at this juncture that Harper told investigators that "during a professional development training, [Shelly's niece] showed teachers an exemplar and commented 'that was on the test.'" (Doc. 26-9 at 4). As to her second claim, however, Harper admitted she had no evidence that Shelley and White believed she did not support Swann. (Doc. 26-1 at 10–11). In fact, Harper asked White for a Matt Swann campaign sign, and White "actually came to [her] home, at [her] request, and put a Matt Swann sign in [her] house." (Doc. 26-1 at 10). And Harper never discussed with Shelley who she supported in the election. (Doc. 26-1 at 24).

Harper supposes that White might have told Shelley that Harper declined White's invitation to pass out fliers on two occasions and to attend a rummage sale. But Harper does not remember much of the conversation regarding the rummage sale, just that she ultimately did not go to the sale. (Doc. 26-1 at 18). She decided not to go because she heard in a conversation with White and other staff members that some attendees would be wearing Matt Swann shirts. (Doc. 26-1 at 21–22). Harper also does not remember any details from the conversations about passing out fliers, only that she did not pass them out. (Doc. 26-1 at 19–20).

When Harper spoke with the other nonrenewed teacher, that teacher said she believed she was nonrenewed for not being willing to change grade levels when asked. (Doc. 26-1 at 11–12).

*Other Testimony*

Shelley recommended Harper and one other third-year teacher for nonrenewal. The reason Shelley nonrenewed the other third-year teacher was that the teacher did not show love and care towards the children. (Doc. 26-5 at 30–31). As for Harper, Shelley stated that she had multiple reasons for recommending her nonrenewal, which together formed the basis for her decision.

First, Marla Rice, a special ed aide at Webb Elementary, complained that Harper "lacked the compassion and care other teachers at Webb Elementary demonstrated." (Doc. 26-4 at 5). Rice's daughter, who had special medical needs, frequently had to miss class. After one absence, Rice's daughter saw some art projects the students had been working on and asked to make-up the missed art project. (Doc. 26-12 at 2–3). Despite some art projects still being incomplete, Harper refused to allow Rice's daughter to do the art project. (Doc. 26-12 at 3). Rice transferred her daughter out of the class and to a different school later that year. (Doc. 26-12 at 3). Shelley gave Rice's complaint great weight because Rice was both a parent and a special ed aide who interacted daily with faculty. (Doc. 26-4 at 5).

Also, Shelley had never received a similar complaint about a teacher she was considering for renewal. (Doc. 26-4 at 5).

Second, Harper did not include one of the other third-grade teachers, Ms. Brawner, in joint grade-level activities. (Doc. 26-4 at 5).

Third, Shelley found Harper to be insubordinate. One day, Shelley noticed that some children on the playground needed more supervision. (Doc. 26-4 at 6). She saw Harper and another teacher sitting in the gazebo on the playground, so she told them they needed to go watch the children. (Doc. 26-4 at 6). The other teacher immediately got up. (Doc. 26-4 at 6). But Harper ignored Shelley, so Shelley had to watch the children herself. (Doc. 26-4 at 6–7).

Fourth, in front of parents and faculty, Harper said that "her own child was what was important to her" in a manner that made the parents feel like their children were not Harper's main priority. (Doc. 26-4 at 7).

Fifth, Harper lobbied to remain in third-grade after Shelley had told faculty that she was considering reassigning teachers. (Doc. 26-4 at 7). Shelley felt that Harper was pressuring her and was unwilling to serve where needed. (Doc. 26-4 at 7–8).

Although Shelley testified that she considered each of the above factors in making her decision, Shelley testified she neither knew nor cared who Harper supported in the campaign and never spoke to White or any other person about who

Webb Elementary employees, including Harper, supported in the campaign. (Doc. 26-4 at 3). Shelley also emphasized that she had made her nonrenewal decision before the investigation began into alleged cheating at Webb. (Doc. 26-3 at 4; Doc. 26-5 at 36). The investigation stemmed from the Board's HR Director telling Pitchford about anonymous allegations that cheating had occurred at Webb. (Doc. 26-3 at 3). Pitchford reported the allegations, and Haddock began to investigate. (Doc. 26-9 at 3–4).

One week later, Pitchford went to Webb Elementary to announce the investigation. (Doc. 26-3 at 5). Before the meeting, Pitchford met with Shelley and asked if she had any nonrenewals, because the deadline for nonrenewals was approaching. (Doc. 26-3 at 5). After another week had passed, Haddock and Jackson interviewed Harper. (Doc. 26-8 at 14). During the interview, Harper told the investigators that "during a professional development training, [Shelly's niece] showed teachers an exemplar and commented 'that was on the test.'" (Doc. 26-8 at 15–16; Doc. 26-9 at 4). Defendants claim no one could have known about Harper's statement any earlier than this interview, a full week after Shelley had already made her decision to nonrenew Harper. (Doc. 27 at 34–35).

## STANDARD

The court will grant summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). The moving party need not produce evidence disproving the opponent's claim; instead, the moving party must demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In turn, the nonmoving party must go beyond mere allegations to offer specific facts showing a genuine issue for trial exists. *Id.* at 324. When no genuine issue of material fact exists, the court determines whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## DISCUSSION

The issues presented in the motion and response papers are whether Harper's nonrenewal was unconstitutional retaliation in violation of her First Amendment rights. To prove a claim under Section 1983, Harper must show she was "deprived of a federal right by a person acting under color of state law." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). Harper notes that the Board is a state agency and that the other defendants were state employees. (Doc. 1 at 1–2). She also alleges that Defendants deprived her of her free speech and free association rights under the First Amendment. (Doc. 1 at 7). Defendants argue that no substantial evidence exists that Harper was nonrenewed for an unconstitutional reason and that Defendants in fact had legitimate reasons for nonrenewing Harper. (Doc. 27 at 11). The court finds that Defendants' motion for summary judgment should be granted

because there is no substantial evidence that Defendants violated Harper's free speech and free association rights.

## I. Interested Witnesses

As a preliminary matter, Harper relies on a partial-reading of *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), to argue that the court cannot consider evidence from interested witnesses. (Doc. 29 at 1); *see also Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1205 n.14 (11th Cir. 2013) (quoting *Reeves*, 530 U.S. at 151) (holding that court cannot "credit evidence favoring the moving party unless that evidence is 'uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses"). Here, Harper says that almost all the available evidence is not proper for decision on summary judgment because it is offered by interested persons. Harper claims that, as the defendants, Pitchford, Shelley, and White are all interested. (Doc. 29 at 2). Harper also claims that Haddock is an interested witness as a colleague of Defendants. (Doc. 29 at 2).

The Eleventh Circuit has summarized the point Harper is trying to make in this way: "One cannot 'refute' a witness's statements using another witness's statements at summary judgment; such a swearing contest is one for the jury to resolve." *Jackson v. West*, 787 F.3d 1345, 1357 n.6 (11th Cir. 2015). But on a closer reading of *Reeves*, the Court's holding is more nuanced than Harper represents. The Court explained that a district court can consider uncontradicted evidence from

interested witnesses when the party's "burden is one of production, not persuasion…." *Reeves*, 530 U.S. at 142. This difference between allowing evidence from disinterested witnesses during production and persuasion exists because during production there is "no credibility assessment." *Id.* (quoting *St. Mary's Honor Ctr v. Hicks*, 509 U.S. 502, 509 (1993)).

In *Kidd*, a Title VII case, the plaintiff claimed that some witnesses were interested. The court held that the plaintiff "ignore[d] the fact that the employer's burden is not one of persuasion but a burden of *production*, which itself 'can involve no credibility assessment.'" *Kidd*, 731 F.3d at 1205 n.14 (quoting *Reeves*, 530 U.S. at 142). The court noted that preventing an employer from relying on the *uncontradicted* sworn statements of its decisionmaker employees would lead to the absurd result of completely barring the court "from considering an employer's legitimate, non-discriminatory reason for hiring one individual over another." *Id.*

Completely barring testimony from Pitchford, Shelley, White, Haddock, and Harper as interested parties would lead the court to the same absurd result of which the *Kidd* court warned. So, the court will consider the *uncontradicted* statements from each party.

Harper contradicts Defendants only on a few points, issues subject to a "swearing contest" before a jury. Specifically, Harper claims that she did not exclude the other third grade teacher, that she did not say that her child was more important

than her students, and that the playground incident did not happen. Harper's version of these facts will be taken as true. Setting aside these disputed facts, however, the court still finds that Defendants' motion for summary judgment should be granted.

## II. First Amendment

### A. Free Speech

"A government employer may not demote or discharge a public employee in retaliation for speech protected by the First Amendment." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015) (citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989). Public servants "must accept certain limitations" on their freedoms, including those protected by the First Amendment. *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). But that public employee does not "relinquish the First Amendment rights [she] would otherwise enjoy as [a citizen] to comment on matters of public interest." *Id.* (quoting *Pickering v. Bd of Educ.*, 391 U.S. 563, 568 (1968).

The court follows a four-step analysis when evaluating public employees' free speech retaliation claims. *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617–18 (11th Cir. 2015). To determine whether the First Amendment protects the employee's speech, the court first analyzes two questions of law. *Id.* at 618. First, the court asks whether the employee spoke as a citizen on "a matter of public concern." *Id.* at 617 (quoting *Carter v. City of Melbourne*, 731 F.3d 1161, 1168–69

(11th Cir. 2013)). An employee who speaks pursuant to the employee's "ordinary job duties" is not speaking on a matter of public concern, ending any further inquiry.[2] *See Lane v. Franks*, 573 U.S. 228, 238 (2014). This standard refers to the duty, not the speech itself. *Fernandez v. Sch. Bd. of Miami-Dade Cty*, 898 F.3d 1324, 1333–34 (11th Cir. 2018). So, speech connected to an ordinary duty, even if part of an extraordinary event, is not subject to the First Amendment's protection. *Id.*

When determining an employee's official duties, "[t]he central inquiry is whether the speech at issue 'owes its existence' to the employee's professional responsibilities." *Moss*, 782 F.3d at 618 (quoting *Garcetti*, 547 U.S. at 424). For example, in *Fernandez* the court found that a principal's speech to pursue charter school status was part of his ordinary job duties although he had never before been a part of charter school discussions as part of his job. 898 F.3d at 1333–34. Similarly, in *Alves* when some employees drafted an out-of-the-ordinary memo to report poor leadership and management, the court noted the memo did "not bear the hallmarks of daily activity…." 804 F.3d at 1165. The court did, however, find that the employees wrote the memo "in the course of performing—or, more accurately, in the course of *trying* to perform—their ordinary roles…." *Id.* at 1164–65. When

---

[2] Before *Lane v. Franks*, the standard was "pursuant to the employee's official duties" instead of "pursuant to the employee's ordinary job duties." *Fernandez v. Sch. Bd. of Miami-Dade Cty*, 898 F.3d 1324, 1333 (11th Cir. 2018). The Eleventh Circuit noted that *Lane* modified the phrasing slightly without making a substantive change. *Id.* So, this "did not create a substantial shift in the law but rather, if anything, offered a slight modification and a useful clarification." *Id.* (internal quotation marks omitted).

making this determination, the court looks to relevant but non-dispositive "[f]actors such as the employee's job description, whether the speech occurred at the workplace, and whether the speech concerns the subject matter of the employee's job…." *Moss*, 782 F.3d at 618.

If the employee's speech meets that threshold, the court then weighs the employee's First Amendment interests against the employer's interest in regulating speech "to promote the efficiency of the public services it performs through its employees." *Id.* (quoting *Carter*, 731 F.3d at 1168–69) (internal quotation marks omitted)). These First Amendment protections apply both outside and within the course of an employee's ordinary job responsibilities.

The third and fourth steps involve "questions of fact that address the causal link between the speech and the adverse employment action." *Alves*, 804 F.3d at 1159 n.4. If the First Amendment protects the employee's speech, the employee bears the burden of showing that his speech was a "substantial motivating factor" in his termination. *Moss*, 782 F.3d at 618. Then, if the employee meets this burden, the burden shifts to the employer "to prove that it would have terminated [the employee] even in the absence of his speech." *Id.*

Here, Harper spoke pursuant to her "ordinary job duties," so the speech was not protected by the First Amendment. The only reason Harper spoke about Shelley's niece was as part of a workplace investigation. Unlike the public testimony

in *Lane v. Franks*, Harper's discussion with investigators occurred in a private interview at her workplace and concerned test taking procedures at Webb Elementary involving her job as a teacher. *Cf.* 573 U.S. at 231. Nor was the investigation a matter of public concern. There is no evidence that the investigation was known outside Webb Elementary or outside the school officials participating in the investigation. Ultimately, the internal investigation did not turn up any testing violations. So, as a legal matter, Harper's free speech claim fails.

Even if Harper could meet the legal threshold of proving she spoke as a private citizen on a matter of public concern, she has not provided evidence that her cheating allegation played any role in her nonrenewal. Defendants deny that this allegation motivated Harper's termination. In fact, the only evidence on point shows that Harper did not make the cheating allegation until after Defendants had decided to nonrenew her. When asked about the timing of the nonrenewal decision, Harper could only respond that she did not know when the decision was made. (Doc. 26-1 at 8). Moreover, Harper does not point to any comparator who was treated better or worse than she was because of his or her statements to the investigator.

Defendants have also presented evidence that they would not have renewed Harper anyway. Shelley felt after hearing Rice's complaint that Harper did not show the amount of love and care for the children that Shelley expected. Lacking sufficient love and care is the same reason that Shelley decided not to renew another teacher

that same year. Without meaningful direct or circumstantial evidence to support Harper's factual position, her claim cannot survive summary judgment.

## B. Free Association

Firing a government employee on the basis of political activity is generally unconstitutional. *See Ezell v. Wynn*, 802 F.3d 1217, 1223 (11th Cir. 2015) (citing *Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980)). Free association is "cut from the same cloth" as free speech and follows roughly the same legal framework. *D'Angelo v. Sch. Bd of Polk Cty*, 497 F.3d 1203, 1212 (11th Cir. 2007). To prove a free association claim, the employee must show that the employee associated as a citizen. *See Moss*, 782 F.3d at 618 (describing free speech standard); *D'Angelo*, 497 F.3d at 1212 (holding that "associational activity by public employees need not be on matters of public concern to be protected under the First Amendment" but employee must still act as a citizen). If the public employee was acting as a citizen, then the court balances the public employee's interest in the association against the employer's interest in regulating association "to promote the efficiency of the public services it performs through its employees." *See Moss*, 782 F.3d at 618.

If the First Amendment protects the employee's association, the employee bears the burden of showing that her association was a "substantial motivating factor" in her termination. *See id.* At this step, motive matters. The court's inquiry

focuses on the government employer's motive, even if the government employer was mistaken about the employee's political participation. *Heffernan v. City of Paterson*, 136 S.Ct. 1412, 1418 (2016). Then, if the employee meets this burden, the burden shifts to the employer "to prove that it would have terminated [the employee] even in the absence" of the employee's association. *See Moss*, 782 F.3d at 618.

On balance, it is almost always inappropriate for a government employer to terminate one of its employees for political association or lack thereof. Thus, Harper's free association complaint passes the legal threshold.

Yet Harper's claim fails to clear the factual hurdle. Harper has not presented any evidence that her perceived lack of support for Swann was the cause of or even a factor in her termination. It is undisputed at this juncture that White and Shelley discussed Harper's nonrenewal, as did White and Pitchford. (Doc. 26-3 at 5; Doc. 30 at 38, 40) Harper's theory is that White may have told Shelley that Harper did not support Swann and that Shelley may have then told Pitchford.

This theory is not supported by substantial evidence. It fails for at least two reasons.

First, it is undisputed that Harper supported Swann, not his opponent, and Harper admitted that she has no evidence that anyone believed otherwise. (Doc. 26-1 at 10–11). For her part, Shelley testified she neither knew nor cared whom Harper supported in the superintendent election. And Harper never discussed with Shelley

who she supported in the election. (Doc. 26-1 at 24). White testified that he thought Harper supported Swann because Harper had told him she did. It is undisputed that Harper asked White for a Swann campaign sign, which White put in Harper's house. (Doc. 26-1 at 10). It makes no sense for Harper to claim that she was fired for supporting Swann's opponent—whom she did not support—and there is no evidence that anyone erroneously believed she did.

Second, even if there were evidence that someone erroneously thought Harper supported Swann's opponent or that she was insufficiently eager in her support of Swann, there is no substantial evidence that this erroneous belief led to Harper being nonrenewed. Harper does not point to any other person who was nonrenewed or otherwise sanctioned for not supporting Swann or for supporting Swann's opponent. She also does not point to anyone who was rewarded for supporting Swann. Nor does Harper complain that her replacement was a Swann supporter. *See, e.g.*, *Gossard v. JP Morgan Chase & Co.*, 389 F. App'x 936, 939 (11th Cir. 2010) ("Because Plaintiff failed to present comparator evidence …, she failed to provide 'a basis for inferring that discrimination [was] the reason for the employment decision.'" (quoting *Pace v. S. Ry. Sys.*, 701 F.2d 1383, 1390 (11th Cir. 1983)). Instead, Harper's sole basis for alleging political retaliation is her speculative assertion that White may have told Shelley that Harper declined White's invitation to pass out fliers on two occasions and noticed she did not attend a rummage sale. A

plaintiff cannot survive summary judgment based on speculation. Harper's free association theory fails to meet the causal threshold she must clear to avoid summary judgment.

### III. Claims Against the Board

Harper's claims against the Board fail for an additional reason. A school board is only liable for the acts for which it is "actually responsible." *Marsh v. Butler Cty*, 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561–53 (2007). "Respondeat superior or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. New York City Dep't of Soc. Servs*, 436 U.S. 658, 694–95 (1978)). Here, Harper seeks to hold the Board liable under the cat's paw theory, which is commonly used in Title VII litigation. *See, e.g.*, *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).

While the Eleventh Circuit has not yet addressed the cat's paw theory's place in Section 1983 litigation, many of our sister courts have found that "the cat's paw theory does not apply in the § 1983 context." *Jackson v. City of Centreville*, 899 F. Supp. 2d 1209, 1222 (N.D. Ala. 2012) (quoting *Files v. DeKalb Cty Sch. Dist.*, 2012 WL 716055, *3–4 (N.D. Ga. 2012); *see also Waters v. City of Chicago*, 580 F.3d 575, 586 n.2 (7th Cir. 20009) ("Imputing a nondecisionmaker's motive to a municipal employer sounds a lot like respondeat superior liability. Given that well

developed § 1983 municipal liability law recognizes delegation and ratification, there seems to be little point in trying to awkwardly fit the cat's paw concept in this area of civil rights law."). Rejecting the cat's paw theory for Section 1983 litigation supports the Supreme Court's holding in *Monell*: local governments may be sued under Section 1983 for their policies and customs—not for injuries inflicted solely by their employees or agents. 436 U.S. at 694. The court declines Harper's invitation to extend cat's paw theory liability to the Section 1983 context. And because Harper has presented no evidence of an unconstitutional policy or custom of the Board, Harper's claim against the Board fails. *See Craig v. Floyd Cty*, 643 F.3d 1306, 1311 (11th Cir. 2011) (holding that "'[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability against a municipality'").

## IV. Claims Against the Individual Defendants

Finally, even if Harper's nonrenewal violated her free speech and free association rights, Pitchford, Shelley, and White are entitled to qualified immunity. In Harper's complaint, she cites *Lane v. Franks* as clearly establishing the unconstitutionality of retaliating against a public employee for providing information to an investigator. (Doc. 1 at 8). Harper's interpretation is at least one level of abstraction too far. In *Lane v. Franks*, the employee testified in an open court proceeding to fulfill a duty common to all persons called before the court. 573 U.S. at 238. Here, in contrast, Harper made an allegation to two investigators as part of a

workplace investigation. Harper's reading of case law regarding free association and the cat's paw theory suffers the same problem. (Doc. 1 at 8–9). The cases Harper cites are not similar to Harper's case, and the disputes between Harper and Defendants on this point of law serve only to highlight that this question was not beyond debate at the time Pitchford, Shelley, and White acted.

Moreover, Harper only raised this issue in her complaint, declining to respond to Defendants' motion for summary judgment. An issue is abandoned if the plaintiff, after raising the issue in the complaint, fails to argue it in response to a motion for summary judgment. *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001). It is an "unremarkable proposition that assertions made in the pleadings …, but not made in opposition to a motion for summary judgment, need not be considered by the district court … in ruling on the motion for summary judgment." *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 892 (11th Cir. 1999).

Here, Harper did not dispute that Pitchford, Shelley, and White were performing discretionary functions and that their actions did not violate clearly established law. Harper has not presented any convincing precedent to suggest that a reasonable school official would have known nonrenewing Harper in this situation would be unconstitutional. Thus, even if Harper's claims had merit, Pitchford, Shelley, and White would be entitled to qualified immunity.

## CONCLUSION

Based on the above reasoning, Defendants' Motion for Summary Judgment is GRANTED.

**DONE** and **ORDERED** this 12th day of July 2019.

_____/s/ Andrew L. Brasher_____
ANDREW L. BRASHER
UNITED STATES DISTRICT JUDGE